### JAMES W. CALLAWAY v. EQUITABLE TRUST COMPANY ET AL.

Argued November 11, 1901—Decided January 10, 1902.

1. A real estate broker who, at the inception of negotiations for a lease and during their continuance, represented the tenant and not the landlord, has no claim upon the latter for commissions.
2. An admission made by an agent, in order to bind his principal, must have been made within the scope of his authority and in the course of the negotiations to which it referred.
3. An inference that an attorney-at-law has authority to bind his clients to pay commissions to a broker for obtaining a tenant does not arise from the fact that he knew of such claim at the time he superintended the execution of the lease between the principals.

---

On rule to show cause.

Before DEPUE, CHIEF JUSTICE, and Justices GARRISON, GUMMERE and COLLINS.

For the plaintiff, *Robert H. Ingersoll.*

For the defendants, *Clarence Cole.*

The opinion of the court was delivered by

GARRISON, J.　The plaintiff holds his verdict against the three defendants named in the declaration under a charge of the trial court in which the jury was instructed that the defendants could be held liable as individuals only and not as trustees, and that an employment or ratification by one of the defendants could not bind the others, also that there could be no recovery unless it included all of the defendants.　Accepting this as the law of the case, the question upon this rule is whether the testimony supports the verdict.

The case was this: The plaintiff was a real estate broker at Atlantic City.　A Mr. Dunlop called upon the plaintiff to inquire what hotels in Atlantic City were for rent.　The Hotel Waldorf-Astoria being mentioned, Mr. Dunlop asked the plaintiff if he could show it to him.　A similar conversation took place as the plaintiff and Dunlop were passing the hotel upon the boardwalk.　The hotel was in charge of a caretaker, and bore a sign that the property was for rent and that application should be made to the Equitable Trust Company of Philadelphia.　After the above conversations, and as a result of them, the plaintiff applied to the person in charge of the hotel for permission to inspect it, and was referred to the Equitable Trust Company.　The plaintiff then wrote to the trust company that he had a man who would like to look through the hotel, and asked that a permit to that effect be wired to him.　Such a permit was wired by Mr. Wilcox, the trust officer of that institution, followed by a letter in answer to a request of the plaintiff for the terms for the house and bar separately.　The plaintiff and Dunlop inspected the property, and subsequently met in Philadelphia and went to the trust company, the plaintiff reaching there first and informing the trust officer who he was and who his party was.　Mr. Dunlop came in later, and an agreement as to the terms of letting was reached more favorable to Dunlop than those originally mailed to the plaintiff.　A few days later a lease was executed by the three defendants, as lessors, and by Dunlop, as lessee, and a copy delivered to Dunlop in the presence of John C. Bell, Esq., an attorney-at-law and the legal adviser of

Mrs. Bunn and Mrs. Huncker, two of the defendants. At this interview Mr. Bell dictated a statement that was signed by Dunlop to the effect that he was not a customer of one M. J. Ward, and had not received a telephone message concerning the Hotel Waldorf-Astoria from one Roesser, but that his attention was first called to the hotel at Atlantic City by Mr. Callaway. Mr. Dunlop, on the witness-stand, testified that his first conversation relative to the hotel was in New York with Mr. Bunn, the husband of the defendant, with whom he later had a second talk in Philadelphia, both prior to his meeting with Callaway at Atlantic City.

The plaintiff testified that Mr. Wilcox, upon whom he called after the conclusion of the negotiations between the trust company and Dunlop, told him that he (Callaway) was entitled to commissions, and advised that plaintiff write him a letter that could be submitted to the heirs—meaning Mrs. Bunn and Mrs. Huncker. There is no testimony of any similar statement by Wilcox or by any of the defendants prior to or pending the negotiations for the lease, or any proof that the matter of the plaintiff's commissions or of his agency for the defendants was in anywise alluded to at any interview or in any of the correspondence pending the negotiations for the lease.

Upon this state of the testimony, amplified, perhaps, but not materially varied, by details, a motion for a nonsuit was refused, and the question was submitted to the jury whether the plaintiff had proved that he was employed by the defendants to obtain a tenant for their hotel, or whether his agency in that respect had been accepted as such by them or ratified in their behalf. The jury returned a general verdict for the plaintiff.

In my opinion there is no basis in the testimony upon which this verdict can rest. Upon the plaintiff's own showing he came into the negotiation, not under an employment by the defendants, but at the request of Dunlop. In his application to the trust company for permission to inspect the property, and in inquiring the terms at which it could be rented, the plaintiff was doing for Dunlop just what Dunlop would have had to do for himself in view of the notice affixed to the

premises and the response of the janitor in charge, viz., apply to the trust company. In fine, at the inception of the negotiation, the plaintiff was the agent of Dunlop. This legal relation grew out of the facts testified to by the plaintiff, and was inseparable from them whatever might have been his understanding or motive at the time. This being so, the subsequent bargaining for terms was conducted by Mr. Wilcox and the trust company upon one side and by the plaintiff and Mr. Dunlop upon the other, and during the transaction nothing was said or done by which the agency of the plaintiff was transferred from his original principal to the trust company, or by which the latter could, by any stretch of implication, have so understood.

If, therefore, the verdict of the jury rests upon a finding by it that the plaintiff was at any time employed by the defendants as their broker, it is entirely unsupported by the proofs.

There are two other circumstances upon which the verdict may have been rested—*first,* that Mr. Wilcox told the plaintiff that he was entitled to commissions, and *second,* that Mr. Bell had knowledge of the claim for commissions when he superintended the execution of the lease and dictated the statement signed by Dunlop. With respect to the former of these contentions, it is sufficient to say that, as an agent of the trust company, Mr. Dunlop was without apparent authority to bind it by his admissions—still less so to bind the other defendants—and further, that the remark ascribed to him was made after the close of the negotiation to which it referred, to wit, the procuring of a tenant for the property.

The subsequent execution of the lease, which had also taken place, was a matter in which the broker, as such, had no concern. A broker's commission is earned when he procures a tenant whom his employer accepts. Consequently the remark of the trust officer did not constitute part of the transaction to which the plaintiff was a party, and hence, upon familiar law, was not competent to bind his principal as an admission. *Runk* v. *Ten Eyck,* 4 *Zab.* 756.

The same criticism applies to the part taken by Mr. Bell,

with the added comment that there is no inference that an attorney-at-law has any authority to bind his clients to pay a broker's commission merely because he knew such a claim was being made at the time he superintended the conveyancing on behalf of his clients.

The result of these considerations is that, assuming the truth of the plaintiff's testimony, he should have been non-suited at the trial.

The rule to show cause is made absolute.